Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| B.H., individually and on behalf of K.H. a minor,<br><br>Plaintiff,<br><br>vs.<br><br>ANTHEM HEALTH PLANS of VIRGINIA, INC. D/B/A ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>Defendant. | COMPLAINT<br><br>Case No. 2:22-cv-00294 - JNP |

Plaintiff B.H., individually and on behalf of K.H. a minor, through his undersigned counsel, complains and alleges against Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield ("Anthem") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. B.H. and K.H. are natural persons residing in Prince William County, Virginia. B.H. is K.H.'s father.

1

2. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the insurer and claims administrator, as well as the fiduciary under ERISA for the insurance plan providing coverage for B.H. and K.H. ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). B.H. was a participant in the Plan and K.H. was a beneficiary of the Plan at all relevant times. B.H. and K.H. continue to be participants and beneficiaries of the Plan.

4. K.H. received medical care and treatment at Change Academy Lake of the Ozarks ("CALO") from January 10, 2020, to December 6, 2021. CALO is a licensed residential treatment facility located in Missouri, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. CALO specializes in the treatment of attachment disorders.

5. Anthem denied claims for payment of K.H.'s medical expenses in connection with her treatment at CALO.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah and across the United States through its network of affiliates.

8. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs he will be responsible to pay and that would not be incurred if venue of the case remains in Utah.

Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both his and K.H.'s privacy will be preserved.

9. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### K.H.'s Developmental History and Medical Background

10. K.H. was born in Russia and was placed in an orphanage immediately after birth where she stayed until she was adopted by B.H. around the time that she was thirteen months old.

11. K.H. seemed to adapt well following her adoption but began to struggle around the time that she was in the third grade. She was bullied by many of her peers and began isolating herself. Oftentimes she would have so much anxiety at the thought of going to school that it would cause her to vomit and become ill.

12. K.H. was withdrawn from her public school and started attending a Montessori school. K.H. did well in this environment but the school closed after only a year. K.H. was then homeschooled. K.H. was diagnosed with ADHD and issues with executive functioning. She began taking medications and receiving outpatient treatment.

13. Despite these interventions, K.H. became increasingly withdrawn and less motivated. Although she was an avid dancer, she lost all interest in dance, school, friends, and family. K.H. started meeting with a therapist and was additionally diagnosed with depression and anxiety.

14. Shortly after she began therapy, K.H. was discovered to be self-harming. She stated that she had lost the will to live and was having suicidal ideation. K.H. was then placed in a partial hospitalization program.

15. Instead of helping, K.H.'s self-harming increased during this period, and after one particularly concerning incident K.H. was hospitalized for nine days before returning to the partial hospitalization setting.

16. K.H. began hoarding food, restricting her caloric intake, and showing signs of an eating disorder. Staff in the partial hospitalization program noted that K.H. was becoming increasingly manipulative and defiant and that she was demonstrating signs of reactive attachment disorder. K.H.'s lack of progress led to her being withdrawn from the program prematurely.

17. K.H. began meeting with a new therapist and attending a small private school. K.H. would often leave class without permission and would claim to have several "injuries" multiple times every week in an attempt to get out of class. She would claim to have lost her vision, pretend to lose consciousness, or claim that she had a concussion.

18. On one occasion, K.H. was sleeping in class and when her teacher woke her up, she began screaming and shouting. After this incident, K.H. was asked to leave school and not return without a note from her therapist stating that it was safe for her to do so.

19. K.H.'s therapist refused to write that letter because the therapist was not convinced that K.H. was safe given her ongoing self-harming. Despite her parents' efforts to provide K.H. with round-the-clock supervision, K.H. started harming herself multiple times a day and continued to express suicidal ideation.

20. K.H.'s therapist stated that K.H. required long-term treatment in a residential treatment program in order to stay safe. K.H. was admitted to a partial hospitalization program while B.H. looked for a residential facility which would accept K.H. She only stayed at this facility for a short time however before she was again hospitalized for suicidal ideation.

21. K.H. was then transferred to a local residential facility. K.H.'s clinicians felt that CALO was better equipped to treat the Reactive Attachment Disorder that formed a significant basis of K.H.'s mental health disorders and arrangements were made to transfer her to CALO.

22. Shortly before she was admitted to CALO, entries were found in K.H.'s journal which showed that she had attempted to kill herself by overdosing on her antipsychotic medication, but the attempt had not been successful.

## CALO

23. K.H. was admitted to CALO on January 10, 2020.

24. In a letter dated May 1, 2020, Anthem denied payment for K.H.'s treatment at CALO. The letter gave the following justification for the denial:

> The request tells us you went to a residential treatment center for your mental health condition. The plan clinical criteria considers [sic] residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing

5

serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others, or that you are having serious problems functioning, or you are willing to stay and participate in treatment, or your condition is likely to further improve with this care or get worse without it. For this reason, the request is denied as not medically necessary. There may have been other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

25. On October 19, 2020, B.H. submitted a level one appeal of the denial of payment of K.H.'s treatment at CALO from her admission to discharge.

26. He reminded Anthem that he was entitled to certain protections under ERISA, including a full, fair, and thorough review conducted by appropriately qualified reviewers, which took into account all of the information he provided, gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and gave him the information necessary to perfect the claim.

27. He also asked that Anthem's reviewers be trained in the details of MHPAEA and asked for a physical copy of any and all documentation related to both the initial determination and the level one appeal determination, including a copy of the reviewer's case notes.

28. B.H. alleged that Anthem's denial violated MHPAEA. He pointed out that MHPAEA compelled insurers to offer coverage for mental health services "at parity" with comparable medical or surgical services. He identified skilled nursing, inpatient rehabilitation, and hospice facilities as some of the medical and surgical analogues to the treatment K.H. received.

29. He singled out two primary ways in which he alleged Anthem had violated MHPAEA. The first was its requirement that residential treatment care meet requirements contained only in proprietary criteria while, at the same time, not only exempting analogous medical and surgical facilities from these requirements but not having criteria for these kinds of services at all.

30. The second example he offered of a treatment limitation that violated MHPAEA was Anthem's requirement that K.H. meet acute level symptoms such as being a danger to herself or others, hearing voices, and having persistent thoughts of harm, while not requiring individuals receiving comparable medical or surgical care to be in similar acute distress.

31. He accused Anthem of intentionally utilizing overly restrictive guidelines to limit the availability of mental healthcare, while not limiting medical or surgical care in the same manner. He asked Anthem to conduct a parity compliance analysis on the Plan in order to determine whether Anthem and the Plan were compliant with MHPAEA and to provide him with physical copies of all documentation used in the evaluation.

32. B.H. argued that Anthem's reasons for denial also violated generally accepted standards of medical practice. He contended that Anthem "knowingly and intentionally created guidelines" which allowed it to restrict the availability of residential treatment care by imposing requirements which were not supported by generally accepted standards of medical practice.

33. He wrote that among other things, Anthem was placing an inappropriate emphasis on acuity and crisis stabilization, had not accounted for K.H.'s co-occurring conditions, had recommended a lower level of care even though it was less likely to be effective, failed to

err on the side of caution by recommending a higher level of care when there was ambiguity, and precluded coverage of services which maintained, but did not immediately improve, level of function.

34. He asked Anthem to evaluate K.H.'s treatment using guidelines and materials which conformed to generally accepted standards of medical practice as well as federal law, such as the definition of medical necessity found in the insurance policy.

35. B.H. included a copy of a Psychoeducational Evaluation documenting K.H.'s struggles with ADHD, letters of medical necessity, and a copy of K.H.'s medical records with the appeal.

36. One such letter from Norman Jacobowitz, MSN, PMHNP-BC dated July 20, 2020, recommended that:

> Given the persistence of her symptoms since age 11 or so, with increasing severity and escalation of suicidal ideation and self-harm, and despite continued outpatient therapy and medication monitoring, a more intense level of treatment became necessary and she was hospitalized in December 2019 for suicidal ideation and self injury.
>
> A residential level of care [was] necessary after that hospitalization to achieve significant and lasting improvement of [K.H.]'s severe psychiatric symptoms. I consider this to have been a medically necessary treatment course.

37. In addition, K.H.'s medical records showed that she continued to struggle with emotional regulation, food refusal (including writing a letter to CALO staff stating that she planned on starving herself to death), self-harming, anxiety, manipulative behaviors, isolating herself, aggressive behaviors such as throwing things, punching her therapist in the face, and flipping over chairs, and an attempt to injure or kill herself by throwing herself over a stair railing.

38. K.H.'s medical records show that she struggled with these issues at CALO even while she was in a supportive and controlled residential treatment environment.

39. In the event the denial was upheld, B.H. asked to be provided with a copy of all documentation under which the Plan was operated including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any medical necessity criteria utilized in the determination, as well as their medical or surgical equivalents (whether or not these were used), along with any reports or opinions from any physician or other professional regarding the claim, along with their names, qualifications, and denial rates. (Collectively the "Plan Documents")

40. He asked that if Anthem did not possess these documents or was not acting on behalf of the Plan Administrator in this regard that it forward his request to the appropriate entity.

41. In a letter dated January 13, 2021, Anthem upheld the denial of payment for K.H.'s treatment. The letter gave the following justification for the denial:

> We have re-reviewed your specific circumstances and health condition as documented in the appeal and medical records provided to us by your treating physician. The reviewer is a health plan Medical Director an MD who is board certified and specializes in Psychiatry. It's their recommendation that we keep our previous coverage decision. Here's why:
>
> We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to have residential treatment center care. The reason we were given for this was that you were at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record plus letters. We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason: you were not at risk for serious harm that you needed 24 hour care. You could have been treated with outpatient services. We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B:902- RES).

42. On February 11, 2021, B.H. requested that the denial of payment be evaluated by an external review agency. B.H. pointed out that Anthem had covered K.H.'s inpatient hospitalization and residential treatment immediately prior to her admission to CALO but had not approved her time at CALO.

43. He stated that it was essential for K.H. to receive the mental health treatment she received at CALO, not only to address her reactive attachment disorder, but also to prevent her from developing other serious conditions such as borderline personality disorder when she became an adult.

44. He wrote that Anthem continued to rely on inappropriate qualifications such as a requirement that K.H. present a danger to herself or others. He stated that not only was this requirement troubling, but it made him doubt that Anthem had sufficiently reviewed the information he provided in his appeal, as he had highlighted instances in the medical records such as K.H. posturing and then punching her therapist in the face or trying to throw herself over a stair railing.

45. He expressed concern that Anthem had not referenced any of the clinical evidence he had included in the appeal and asked the external reviewer to make direct references to the specific clinical evidence relied upon to evaluate the claim.

46. He asked that the reviewer be appropriately qualified and that they not use Anthem's MCG criteria to evaluate K.H.'s treatment as these did not meet generally accepted standards of medical practice and had not been peer reviewed by any independent organization. He asked that the reviewer rely instead on the definition of medical necessity in the insurance policy.

47. He again requested to be provided with a copy of the Plan Documents.

48. In a report dated March 31, 2021, the external review agency partially overturned the denial of payment for K.H.'s treatment. The reviewer wrote in pertinent part:

    > Residential treatment from 01/10/20-09/29/20 is medically necessary. As of 09/30/20 residential treatment was not medically necessary.
    >
    > The claimant is diagnosed with Reactive Attachment Disorder, Major Depressive Disorder, and Anxiety Disorder. For the dates of service 01/10/20-09/29/20 residential treatment is medically necessary for this claimant. The claimant was reported self-harming and showing verbal and physical aggression. The claimant was reported being physically aggressive and punching her therapist in the face requiring emergency safety physical intervention. The claimant required 24-hour nursing supervision for her safety and the safety of others.
    >
    > As of 09/30/20 the claimant was no longer reported to be suicidal, homicidal, or gravely impaired for self-care. The claimant was not reported to be self-harming. She was not severely aggressive. The claimant was not reported having any auditory or visual hallucinations. She was compliant with her medications and denied any major side effects. From the clinical evidence, the claimant could have been safely and effectively treated in a lower level of care such as partial hospitalization from dates of service 09/30/20-11/30/20.

49. Although it was compelled by the external reviewer to approve payment, in a letter dated April 4, 2021, Anthem announced that it was "pleased that we can provide a partially favorable response in this case." Anthem stated that it would provide payment for dates of service from January 10, 2020, through September 29, 2020, however treatment beyond that date would remain not medically necessary.

50. Anthem did not provide B.H. with additional opportunity to appeal the specific time frames for denial beginning September 30, 2020, and thereafter, despite the change in position Anthem adopted in light of the external review.

51. The Plaintiff exhausted his pre-litigation appeal obligations under the terms of the Plan and ERISA.

52. The denial of benefits for K.H.'s treatment beginning September 30, 2020, and continuing thereafter for the remainder of K.H.'s course of treatment at CALO was a

11

breach of contract and have caused B.H. to incur medical expenses that should have been paid by the Plan in an amount totaling over $330,000.

53. Anthem failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of B.H.'s requests.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

54. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan.

55. Anthem and the Plan failed to provide coverage for K.H.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

56. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

57. The denial letters produced by Anthem do little to elucidate whether Anthem conducted a meaningful analysis of the Plaintiff's appeals or whether it provided him with the "full and fair review" to which he is entitled. Anthem failed to substantively respond to the issues presented in B.H.'s appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

58. Anthem and the agents of the Plan breached their fiduciary duties to K.H. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in K.H.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of K.H.'s claims.

59. The actions of Anthem and the Plan in failing to provide coverage for K.H.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

60. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

61. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

62. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

63. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on

medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

64. The medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

65. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for K.H.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

66. For none of these types of treatment does Anthem exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

67. The Departments of Labor and Health and Human Services jointly compiled a list of "warning signs" which often accompany a violation of MHPAEA. One such sign of a likely MHPAEA violation is the requirement of improvement for mental health services, but not for medical or surgical services. Anthem stated that individuals receiving residential treatment care are "expected to either improve with this care, or to keep from

getting worse." Plaintiff is aware of no such requirement for comparable medical or surgical services to be approved.

68. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

69. Anthem and the Plan evaluated K.H.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

70. Plaintiff identified two specific examples of disparate application of medical necessity criteria between medical/surgical and mental health treatment, one was Anthem's reviewers' improper utilization of acute medical necessity criteria to evaluate the non-acute treatment that K.H. received. Anthem's improper use of acute inpatient medical necessity criteria is revealed in the statements in Anthem's denial letters such as:

> The plan clinical criteria considers [sic] residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care).[1]

71. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that K.H. received. The Plan does not require individuals receiving treatment at sub-acute inpatient

---

[1] The letter states that treatment can also be deemed necessary due to serious problems with functioning and gave examples such as refusing to eat or avoiding personal interactions. Although K.H. exhibited these symptoms Anthem largely did not acknowledge them and primarily based its denials on acute level requirements.

facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

72. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

73. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice.

74. The Defendant must and does acknowledge that it adheres to generally accepted standards of medical practice when it evaluates the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

75. This requirement of acute level symptoms for a non-acute level of care was not limited to Anthem, but also was clearly provided as the rationale for denial by the external reviewer after September 30, 2020. The external reviewer denied further payment due to:

> As of 09/30/20 the claimant was no longer reported to be suicidal, homicidal, or gravely impaired for self-care. The claimant was not reported to be self-harming. She was not severely aggressive. The claimant was not reported having any auditory or visual hallucinations. She was compliant with her medications and denied any major side effects.

76. The second example of a MHPAEA violation identified by B.H. was his claim that Anthem restricted the availability of K.H.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. B.H. argued that not only did Anthem exempt comparable medical or surgical services from these requirements, but it

did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. B.H. requested to be provided with these criteria if they existed, but Anthem ignored these requests.

77. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

78. Anthem and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Anthem and the Plan were not in compliance with MHPAEA.

79. In fact, despite B.H.'s request that Anthem and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Anthem and the Plan have not provided B.H. with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Anthem and the Plan have not provided B.H. with any information about the results of this analysis.

80. The violations of MHPAEA by Anthem and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendant violate MHPAEA;

    (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

    (e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for his loss;

    (g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendant to the Plaintiff for his loss arising out of the Defendant's violation of MHPAEA.

81. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for K.H.'s medically necessary treatment at CALO under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's

Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 29th day of April, 2022.

By    s/ Brian S. King
       Brian S. King
       Attorney for Plaintiff

County of Plaintiff's Residence:
Prince William County, Virginia

19