**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| **B.H.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 3:22-cv-00600-RCY** |
| ) | |
| **ANTHEM HEALTH PLANS OF VIRGINIA,** ) | |
| **INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## REPORT AND RECOMMENDATION

This matter comes before the undersigned Magistrate Judge for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B) on Defendant Anthem Health Plans of Virginia, Inc.'s ("Anthem") Partial Motion to Dismiss Complaint ("Motion to Dismiss"). (ECF Nos. 21, 44.) Anthem's motion, filed under Federal Rule of Civil Procedure 12(b)(6), seeks dismissal of the second claim in Plaintiff B.H.'s Complaint, which asserts violations under the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), an amendment to the Employee Retirement Income Security Act ("ERISA"). B.H. filed his Opposition to the Motion to Dismiss, and Anthem filed its Reply in support thereof. (ECF Nos. 38, 40.) The Court dispenses with oral argument because the materials before the Court adequately present the facts and legal contentions and argument would not aid the decisional process. E.D. Va. Loc. Civ. R. 7(J). The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331. The matter is ripe for disposition.

Having considered the parties' arguments, and for the reasons set forth below, the Court RECOMMENDS that Anthem's Motion to Dismiss be DENIED.

## I.    FACTUAL BACKGROUND[1]

Anthem acted as fiduciary and claims administrator for a "fully-insured employee welfare benefits plan" under ERISA, in which B.H. was a participant and his minor child, K.H., was a beneficiary.  (ECF No. 2, ¶¶ 2, 3.)  B.H. brings this action individually and on behalf of K.H. to challenge Anthem's decision to deny full coverage for mental health treatment received by K.H.

B.H. adopted K.H. when she was 13 months old.  (*Id.* ¶ 10.)  Although K.H. seemed to adapt well following her adoption, she began to struggle with her mental health in the third grade.  (*Id.* ¶ 11.)  At that time, K.H. faced incidents of bullying in public school, began isolating herself, and developed severe anxiety related to school attendance, which manifested in physical symptoms of vomiting and becoming ill.  (*Id.*)  As a result, K.H. withdrew from public school, enrolled in a Montessori school, and later received homeschooling.  (*Id.* ¶ 12.)

K.H. later received a diagnosis of ADHD and exhibited issues with executive functioning.  (*Id.*)  She began taking medications and receiving outpatient treatment but nevertheless "became increasingly withdrawn and less motivated."  (*Id.* ¶¶ 12, 13.)  After meeting with a therapist, K.H. received a diagnosis of depression and anxiety.  (*Id.*)  Therapy revealed that K.H. was "self-harming," "had lost the will to live[,] and was having suicidal ideation."  (*Id.* ¶ 14.)  This resulted in K.H.'s admission to a partial hospitalization program.  (*Id.*)  "Instead of helping, K.H.'s self-harming increased during this period," resulting in a nine-day hospitalization before a return to the partial hospitalization setting.  (*Id.* ¶ 15.)  During this program, K.H. exhibited signs of an eating disorder, became increasingly manipulative and defiant, and showed signs of reactive attachment disorder.  (*Id.* ¶ 16.)  She withdrew from the program due to her lack of improvement.  (*Id.*)

---

[1] For purposes of ruling on the Motion to Dismiss, the Court "must assume that the allegations of the complaint are true and construe them in the light most favorable to [B.H.]." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Thereafter, K.H. enrolled in a private school and began seeing a new therapist.  (*Id.* ¶ 17.) She did not adjust well to school.  K.H. often left class without permission or would concoct injuries to miss class (e.g., loss of vision, loss of consciousness, concussion).  (*Id.*)  The school asked K.H. to leave after an incident in which she fell asleep in class and began screaming and shouting at the teacher who woke her.  (*Id.* ¶ 18.)  The school instructed that K.H. could not return without a note from a therapist stating that it was safe for her to do so.  (*Id.*)

K.H.'s therapist opined that K.H. required long-term treatment in a residential treatment program to stay safe.  (*Id.* ¶ 20.)  At the time, K.H. continued to express suicidal ideation and started self-harming multiple times a day, despite her parents' efforts to provide her with round-the-clock supervision.  (*Id.* ¶ 19.)  It was also discovered that K.H. had attempted suicide by overdosing on her antipsychotic medication.  (*Id.* ¶ 22.)  K.H. received admission into another partial hospitalization program while B.H. looked for a residential facility but was hospitalized again due to suicidal ideations.  (*Id.* ¶ 20.)

Thereafter, K.H. received residential treatment at Change Academy Lake of the Ozarks ("CALO") from January 10, 2020, to December 6, 2021.  (*Id.* ¶¶ 4, 21.)  CALO, a licensed residential treatment facility, provides sub-acute inpatient treatment to adolescents with mental health problems and specializes in the treatment of attachment disorders.  (*Id.* ¶ 4.)

On May 1, 2020, about four months after K.H.'s admission to CALO, Anthem denied payment for K.H.'s treatment.  (*Id.* ¶ 24.)  In its letter denying coverage, Anthem states:

> The request tells us you went to a residential treatment center for your mental health condition. The plan clinical criteria considers [sic] residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person

3

must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others, or that you are having serious problems functioning, or you are willing to stay and participate in treatment, or your condition is likely to further improve with this care or get worse without it. For this reason, the request is denied as not medically necessary.

(*Id.*)

B.H. appealed this denial and alleged it violated the Parity Act. (*Id.* ¶¶ 25, 28.) In his appeal, he "identified skilled nursing, inpatient rehabilitation, and hospice facilities as some of the medical and surgical analogues to the treatment K.H. received" and pointed out several ways in which the coverage for K.H.'s mental health services were not at parity with those comparable medical or surgical services. (*Id.* ¶¶ 28, 29.) First, he argued that "residential treatment care [must] meet requirements contained only in proprietary criteria" whereas medical and surgical facilities were exempted from or did not have such requirements. (*Id.* ¶ 29.) Next, he alleged that Anthem required K.H. to "meet acute level symptoms such as being a danger to herself or others, hearing voices, and having persistent thoughts of harm, while not requiring individuals receiving comparable medical or surgical care to be in similar acute distress." (*Id.* ¶ 30.) Finally, he argued that Anthem "violated generally accepted standards of medical practice" and created guidelines "which allowed it to restrict the availability of residential treatment care by imposing requirements which were not supported by generally accepted standards of medical practice." (*Id.* ¶ 32.)

B.H. submitted documentation from medical professionals who worked with K.H. and acknowledged the "increasing severity and escalation of suicidal ideation and self-harm [rendering residential treatment care] a medically necessary treatment course." (*Id.* ¶ 36.) B.H. also produced K.H.'s medical records which "showed that she continued to struggle with emotional regulation, food refusal . . . , self-harming, anxiety, manipulative behaviors, isolating herself, aggressive

behaviors such as throwing things, punching her therapist in the face, and flipping over chairs, and an attempt to injure or kill herself by throwing herself over a stair railing." (*Id.* ¶ 37.)

B.H. requested that Anthem provide him with "all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any medical necessity criteria utilized in the determination, as well as their medical or surgical equivalents (whether or not these were used), along with any reports or opinions from any physician or other professional regarding the claim, along with their names, qualifications, and denial rates. (Collectively the 'Plan Documents')." (*Id.* ¶ 39.)

On January 13, 2021, Anthem upheld its denial decision, explaining in part:

We still do not think this is medically necessary for you. We believe our first decision is correct for the following reason: you were not at risk for serious harm that you needed 24 hour care. You could have been treated with outpatient services. We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent.

(*Id.* ¶ 41.) Anthem did not produce any of the requested Plan Documents. (*See id.* ¶¶ 39, 47.)

In response, B.H. requested an evaluation by an external review agency. (*Id.* ¶ 42.) B.H. expressed concern that Anthem had not sufficiently reviewed the information in his appeal and did not appropriately rely on clinical evidence. (*Id.* ¶¶ 44-45.) B.H. also continued to assert violations of the Parity Act, pointing to Anthem's reliance on "inappropriate qualifications such as a requirement that K.H. present a danger to herself or others" and reference to "MCG criteria" which B.H. alleges "did not meet generally accepted standards of medical practice." (*Id.* ¶¶ 44, 46.) At this point, B.H. "again requested to be provided with a copy of the Plan Documents." (*Id.* ¶ 47.)

On March 31, 2021, the external review agency partially overturned the denial decision, finding treatment at CALO for K.H. medically necessary from January 10, 2020 through September 29, 2020. (*Id.* ¶ 48.) The agency found K.H.'s stay at CALO not medically necessary

after September 29, 2020 because there were no reports of K.H. being suicidal, homicidal, or gravely impaired for self-care, nor was there any evidence of her self-harming or being severely aggressive.  (*Id.*)  On April 4, 2021, Anthem adopted the agency's findings and notified B.H. that it would cover payments for treatment rendered from January 10, 2020 through September 29, 2020, but not any treatment beyond this date.  (*Id.* ¶ 49.)

## II.    PROCEDURAL HISTORY

On April 29, 2022, B.H. filed a Complaint against Anthem in the United States District Court for the District of Utah, Central Division.  (ECF No. 2.)  B.H. asserts two causes of action. First, B.H. asserts an ERISA wrongful denial of benefits claim, seeking monetary relief under 29 U.S.C. § 1132(a)(1)(B).  (*Id.* ¶¶ 9, 54-59.)  Second, B.H. asserts an ERISA claim for equitable relief under 29 U.S.C. § 1132(a)(3), seeking a declaration that Anthem violated the Parity Act, an injunction ordering Anthem to comply with the Parity Act, reformation of the Plan, disgorgement of wrongfully obtained funds, and other miscellaneous relief.  (*Id.* ¶¶ 9, 80.)

On September 7, 2022, on the parties' consent, the United States District Court for the District of Utah transferred the case to this Court.  Then, on October 21, 2022, Anthem filed its Motion to Dismiss, arguing that B.H. did not allege a plausible disparity between coverage for mental health care treatment and analogous medical or surgical treatment.

## III.    STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C.*, 980 F.2d at 952 (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on

its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain... a short and plain statement of the claim showing that the pleader is entitled to relief.")  Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough.  *Twombly*, 550 U.S. at 555.  Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged.  *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Francis*, 588 F.3d at 193.  The Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 676-79; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (finding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'") (quoting *Philips v. Pitt Cnty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir.2009)).  This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.

## IV.   ANALYSIS

**A.** **The Court Declines to Consider Anthem's Exhibits in Ruling on the Motion to Dismiss**

As a preliminary matter, the Court must decide the appropriateness of considering the six exhibits Anthem submits with its Motion to Dismiss: (1) the Benefit Booklet (ECF No. 22-1, Ex. A); (2) the residential treatment clinical criteria from 2019 (ECF No. 25, Ex. B); (3) the residential treatment clinical criteria from 2020 (ECF No. 26, Ex. C); (4) the skilled nursing facilities clinical criteria (ECF No. 27, Ex. D); (5) the inpatient rehabilitation clinical criteria (ECF No. 28, Ex. E); and (6) the inpatient hospice care clinical criteria (ECF No. 29, Ex. F).  As discussed below, the Court will not consider these exhibits when determining the sufficiency of B.H.'s Parity Act claim.

"If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998); *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).  However, a court may consider such documents without converting a motion to dismiss into one for summary judgment, "so long as [the documents] are integral to the complaint *and authentic*."  *Philips*, 572 F.3d at 180 (emphasis added).  "A document is authentic when not in dispute by the opposing party."  *GGC Assocs., LLC v. Hamner*, No. 3:17-CV-402, 2017 WL 4295198, at *3 (E.D. Va. Sept. 27, 2017) (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Gasner v. Cty. of Dinwiddie*, 162 F.R.D. 280, 282 (E.D. Va. 1995)).

The Court will not consider these exhibits at this time.  While these documents may be relevant, and even integral, to B.H.'s Complaint, Anthem fails to authenticate them by affidavit or

otherwise (ECF No. 22, at 4, n.3), and B.H. challenges their authenticity (ECF No. 38, at 15-16).[2] B.H. states he has "not yet had an opportunity—before discovery has even begun—to determine if Anthem's attached exhibits are authentic, whether the clinical criteria were in effect for the dates of service, whether the criteria apply, and whether additional criteria are applicable." (*Id.* at 16.)[3]

The Court has similar concerns about whether Anthem has presented the complete and relevant Plan documents for the period in question.  Exhibit A, the Benefit Booklet, does not contain an explicit effective date for coverage.  (*See* ECF No. 22-1.)  In addition, it explains: "The coverage described is based upon the terms of the Group Contract issued to your Group, and the Plan that your Group chose for you.  The Group Contract, this Booklet, and any endorsements, amendments or riders attached, form the entire legal contract under which Covered Services are available." (ECF No. 22-1, at 7.)  Thus, the Benefit Booklet itself appears to refer to documents outside of the booklet as forming the entire Plan document.

---

[2] B.H. also argues it would be unfair to allow Anthem to "refuse to provide these materials" to B.H. after multiple requests and "then argue that Plaintiff has not adequately pleaded his claim" by failing to analyze those very materials it allegedly refused to provide.  (ECF No. 38, at 13.) The Complaint alleges that B.H. requested these documents many times, and Anthem did not provide them.  (ECF No. 2, ¶¶ 39, 47, 53, 78.)  In addition, the Benefit Booklet, which Anthem asks the Court to consider, suggests that participants have a right to such documents upon request. (*See, e.g.*, ECF No. 22-1, at 2 ("Medical Necessity criteria are available upon request."); *id.* at 38 (discussing application of clinical coverage guidelines and other applicable policies and procedures in making Medical Necessity decisions and stating: "You are entitled to ask for and get, free of charge, reasonable access to any records concerning your request."); *id.* at 108 (stating that participants are "entitled to receive, upon request and at no charge" certain information, including "any rule, guideline, protocol or criterion relied upon in the coverage decisions(s)").)  In any event, the Court declines to consider these exhibits due to the challenge to their authenticity.

[3] Anthem contends that "Plaintiffs' counsel was already aware of and in possession of these documents prior to initiation of this litigation, as Anthem has repeatedly produced these same guidelines to counsel in connection with similar litigation."  (ECF No. 40, at 3, n.1.)  The Court notes, however, that Anthem filed Exhibits B through F under seal, referring to them as "proprietary" clinical criteria.  (ECF No. 22, at 9.)  Given Anthem's treatment of these exhibits, the Court finds it reasonable to believe that Plaintiff's counsel, if provided these documents in connection with another litigation, would be restricted from using those documents outside that other litigation.

Further, exhibits B through F appear to be printouts of MCG Care Guidelines from a secure website.  (*See* ECF Nos. 25-29.)  The printouts contain unexpanded sections as well as internal links, making it difficult for the Court to verify their authenticity and completeness.  In addition, although the printouts contain a "Publish Date" at the top ranging from 2019 to 2020, it remains unclear whether these guidelines form the universe of documents relevant to K.H.'s treatment for the dates of service from 2020 to 2021 as well as those for analogous medical or surgical treatment, or whether there are additional, relevant policies, procedure, or criteria.  Indeed, the booklet references "clinical coverage guidelines" as well as "other applicable policies and procedures" as helping Anthem make its "Medical Necessity decisions."  (ECF No. 22-1, at 38.)

Given these facts and considering B.H.'s challenge to authenticity, the Court will not consider the exhibits when deciding the Motion to Dismiss.  *See, e.g.*, *Fleece v. HCA Va. Health Sys.*, No. 3:19-CV-396, 2020 WL 7265851, at *3 (E.D. Va. Dec. 10, 2020) ("When ruling on a motion to dismiss, courts will not consider documents if their authenticity is in dispute.") (citing *Hintz v. Experian Info. Sols., Inc.*, No. 3:10-CV-535, 2010 WL 4025061, at *3 (E.D. Va. Oct. 13, 2010)); *Dumapias v. Haybyrne*, No. 1:20-CV-00297-RDA-TCB, 2020 WL 9260247, at *5 (E.D. Va. Nov. 2, 2020) (declining to consider exhibits attached to a Rule 12(b)(6) motion where authenticity in dispute).

**B.  <u>Background on the Parity Act</u>**

Enacted in 1996, the Parity Act aims to end insurance coverage discrimination "for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."  *Alan R. v. Bank of Am. Grp. Benefits Program*, No. 3:20-CV-00441-RJC-DSC, 2022 WL 413935, at *10 (W.D.N.C. Feb. 9, 2022).  *See also* 29 U.S.C. § 1185a.  As relevant here, the act provides that treatment limitations for mental health disorder

benefits cannot be any more restrictive than those for medical and surgical benefits.  29 U.S.C. § 1185a(a)(3)(A).  In addition, there cannot be any separate treatment limitations that are only applicable to mental health disorder benefits.[4]  *Id.*

To state a Parity Act claim, "a plaintiff must first identify a specific treatment limitation" on mental health benefits.  *T.E. v. Anthem Blue Cross & Blue Shield*, No. 3:22-CV-202-DJH-LLK, 2023 WL 2634059, at *4 (W.D. Ky. Mar. 24, 2023) (internal citations omitted).  When looking at these treatment limitations, the Parity Act considers both quantitative and nonquantitative limitations.  Quantitative limitations are expressed numerically, "while nonquantitative treatment limitations otherwise limit the scope or duration of benefits."  *N.E. v. Blue Cross Blue Shield of N. Carolina & Carson Dellosa Publ'g, LLC*, No. 1:21-CV-684, 2023 WL 2696834, at *9 (M.D.N.C. Feb. 24, 2023) (citing *Michael M. v. Nexsen Pruet Group Med. & Dental Plan*, No. 3:18-CV-00873, 2021 WL 1026383, at *10 (D.S.C. Mar. 21, 2021)).  "Nonquantitative treatment limitations on mental health benefits include medical management standards limiting or excluding benefits based on medical necessity or medical appropriateness and refusal to pay for higher-cost therapies until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or step therapy protocols)."  *Christine S. v. Blue Cross Blue Shield of New Mexico*, 428 F. Supp. 3d 1209, 1219 (D. Utah 2019) (internal citations omitted).  "[A] plan may not impose a nonquantitative limitation for mental health or substance use disorder benefits that is more restrictive than the limitations on comparable medical/surgical benefits."  *N.E.*, 2023 WL 2696834, at *9.  *See also* 29 C.F.R. § 2590.712.

---

[4] The act also prohibits the imposition of more burdensome financial requirements on mental health disorder treatments when compared to medical and surgical benefits.  29 U.S.C. § 1185a(a)(3)(A). The Complaint does not allege discrimination based on financial requirements.

A plaintiff can allege violations of the Parity Act by asserting either "(1) a facial challenge alleging that the terms of a plan discriminate against mental health and substance abuse treatments in comparison to medical or surgical treatment or (2) an as-applied challenge by alleging that the same nonquantitative treatment limitations are applied more stringently to mental health and substance use disorder benefits." *N.E.*, 2023 WL 2696834, at *9; *Michael M.*, 2021 WL 1026383, at *10.  Here, B.H. brings both a facial and as-applied challenge.  (*See, e.g.*, ECF No. 2, ¶ 73.)

### C. B.H.'s Complaint States a Plausible Claim under the Parity Act

To state a claim under the Parity Act, B.H. must: (1) identify what unequal limitation allegedly violated the Parity Act; (2) identify medical or surgical analogues to the mental health treatment at issue; and (3) compare this limitation as it relates to K.H.'s mental health treatment with medical or surgical analogues to show a plausible disparity.  *See N.E.*, 2023 WL 2696834, at *10.[5]  *See also Charles W. v. United Behav. Health*, No. 2:18-CV-829-TC, 2019 WL 6895331, at *4 (D. Utah Dec. 18, 2019); *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-38, 2021 WL 2532905, at *18 (D. Utah June 21, 2021), appeal dismissed (Nov. 30, 2021); *Johnathan Z. v. Oxford Health Plans*, No. 2:18-CV-383-JNP-PMW, 2020 WL 607896, at *13 (D. Utah Feb. 7, 2020) (applying same three-step analysis).

Here, there appears to be no dispute that B.H. has plausibly alleged the first two prongs. For prong one, B.H. alleges that Anthem violated the Parity Act with two unequal limitations. First, B.H. asserts that Anthem imposed a nonquantitative treatment limitation on K.H.'s mental health benefits by forcing her treatment "to comply with requirements contained only within proprietary criteria." (ECF No. 2, ¶ 76). Second, B.H. asserts that Anthem imposed a

---

[5] These elements mirror those identified in the parties' briefing. (ECF No. 22, at 7; ECF No. 38, at 7-8.)

nonquantitative treatment limitation on K.H.'s mental health benefits by utilizing medical necessity criteria that deviate from generally accepted standards of medical practice (*id.* ¶¶ 68-69), including by imposing "acute care requirement[s] for a sub-acute level of care," (*id.* ¶ 66), and requiring individuals receiving residential treatment care to "either improve with this care, or to keep from getting worse," (*id.* ¶ 67).  For prong two, B.H. identifies treatment at "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities" as medical/surgical care facilities analogous to the residential treatment at issue.  (*Id.* ¶¶ 28, 65.)[6]

Anthem contends, however, that B.H. has failed to allege the third prong—a disparity between K.H.'s mental health treatment and the medical or surgical analogues.  (ECF No. 22, at 8.)  Taking the Complaint's well-pleaded allegations as true, viewing them in the light most favorable to B.H., and drawing reasonable inferences in B.H.'s favor, as the Court must do at this stage, the Court finds that B.H. plausibly alleges a Parity Act claim.

### 1. *Pleading the Disparity Prong*

To state a Parity Act claim, the plaintiff must allege a disparity between the nonquantitative treatment limitation with respect to mental health benefits and comparable medical/surgical benefits.  *N.E.*, 2023 WL 2696834, at *10; *Michael M.*, 2021 WL 1026383, at *14.  Here, B.H. alleges that the Plan required K.H.'s treatment for mental health issues to "comply with

---

[6] Anthem contends "inpatient hospice care" is not an analogous benefit.  (ECF No. 22, at 7, n.4.)  Case law appears to be split on this issue.  *Compare Brian S. v. United Healthcare Ins. Co.*, No. 2:21-CV-64 TS, 2021 WL 2444664, at *3 (D. Utah June 15, 2021) ("[O]n motions to dismiss this Court has consistently determined that analogizing mental health residential treatment centers to medical/surgical inpatient hospice and rehabilitation facilities is sufficient to state a Party Act claim."), *with John R. v. United Behavioral Health*, No. 2:18-CV-35-TC, 2019 WL 6255085, at *6, n.8 (D. Utah Nov. 22, 2019) ("The court does not understand how inpatient hospice care is at all analogous to a wilderness therapy program or residential mental health treatment program.").  The Court need not decide this issue because B.H. identifies other medical/surgical care treatment as analogous, and Anthem does not challenge those analogues.

requirements contained only within proprietary criteria," while "exempt[ing] comparable medical or surgical services from these requirements" or not having "proprietary medical or surgical criteria for analogous medical/surgical care at all." (ECF No. 2, ¶¶ 29, 76.) B.H. further alleges that "[t]he medical necessity criteria used by Anthem for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits," (*id.* ¶ 64), including skilled nursing facilities, inpatient hospice care, and rehabilitation facilities (*id.* ¶ 65). Specifically, B.H. asserts that Anthem applied medical necessity criteria that deviated from generally accepted standards of medical practice when evaluating K.H.'s mental health treatment claim but followed generally accepted standards of medical practice when evaluating the medical necessity for analogous levels of medical or surgical benefits. (*Id.* ¶¶ 68-69.) To support this allegation, B.H. quotes from Anthem's letters denying coverage to K.H., contending they show the Plan "impos[ed] restrictions such as an acute care requirement for a sub-acute level of care" on benefits received at a residential treatment center but not on benefits received at analogous medical or surgical facilities. (*Id.* ¶ 66; *see also id.* ¶¶ 24, 41, 70-75.) B.H. also alleges that the denial letters show that the Plan requires individuals receiving residential treatment care to "either improve with this care, or to keep from getting worse," but does not require this for comparable medical or surgical services. (*Id.* ¶ 67; *see also id.* ¶¶ 24, 41.)

Anthem challenges the sufficiency of these allegations. Anthem first contends that the Complaint's allegations are not well-pled because they are either conclusory or legal recitations. (ECF No. 22, at 8.) Anthem next challenges the Complaint's allegations as inconsistent with Anthem's proposed exhibits and encourages the Court to disregard any factual allegations to the

extent they are inconsistent with the exhibits.  (ECF No. 22, at 9-15.)  The Court does not find these arguments persuasive.

        2.   *Plaintiff's Well-Pled Factual Allegations State a Plausible Parity Act Violation*

Anthem first challenges the Complaint's allegations as conclusory or legal recitations, contending that B.H. fails to plead specific, factual details regarding alleged disparities.  (ECF No. 22, at 8.)  Anthem argues that B.H.'s Complaint fails because he does not "specify or enumerate the 'generally accepted standards' that Anthem supposedly failed to meet," nor does he "compare clinical criteria across benefits."  (ECF No. 22, at 10-11.)  The Court, however, finds the Complaint sets forth sufficient factual allegations to state a plausible Parity Act violation.

As an initial matter, the Court notes that B.H. alleges he requested the Plan Documents, including proprietary guidelines, during the administrative claims process and never received them.  (ECF No. 2, ¶¶ 39, 47.)  Thus, "the specifics as to how [Anthem] interpreted and applied the Plan to [K.H.]'s situation is information held within [Anthem]'s exclusive control.  And, as such, 'Plaintiffs cannot be expected to plead facts that are in the possession of Defendants.'"  *K.K. v. United Behav. Health*, No. 2:17-CV-01328-DAK, 2020 WL 262980, at *5 (D. Utah Jan. 17, 2020) (quoting *Kurt W. v. United Healthcare Ins. Co.*, No. 2:19-CV-223, 2019 WL 6790823, at *6 (D. Utah Dec. 12, 2019)).  Rather, "a plaintiff need only plead as much of his prima facie case as possible based on the information in his possession," and given that B.H. alleges he did not have these Plan Documents in his possession at the time of filing his Complaint, he cannot be expected to allege specific details from those documents.  *Nathan W. v. Anthem Bluecross Blueshield of Wisconsin*, No. 2:20-CV-00122-JNP-JCB, 2021 WL 842590, at *7 (D. Utah Mar. 5, 2021); *Timothy D. v. Aetna Health & Life Ins. Co.*, No. 2:18-CV-753-DAK, 2019 WL 2493449, at *3 (D. Utah June 14, 2019).  The Court will not punish B.H. "for not offering [additional] facts when

[his] repeated requests to learn the same have [allegedly] been ignored." *T.E.*, 2023 WL 2634059, at *6 (internal citations omitted).

Anthem cites numerous cases in support of its contention that B.H.'s allegations fail to state a plausible claim. (ECF No. 22, at 11-12, 14-17.) Some are "easily distinguishable because they were decided at the summary-judgment stage."[7] *T.E.*, 2023 WL 2634059, at *5. The Court finds those decided under the motion to dismiss standard distinguishable or otherwise unpersuasive.

First, in *Roy C. v. Aetna Life Ins. Co.*, No. 2:17-CV-1216, 2018 WL 4511972 (D. Utah Sept. 20, 2018), the court granted a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) because the plaintiffs "failed to identify any language or provisions in the Plan that create any sort of disparity between medical and surgical treatment versus mental health and substance abuse treatment" and "failed to sufficiently identify a [medical or surgical] comparison or analogue to wilderness treatment," which was at issue in the case. *Id.* at *3. Here, on the other hand, B.H. has alleged several medical or surgical services analogous to the mental health treatment received by K.H. (ECF No. 2, ¶¶ 28, 65). Similarly, B.H. has alleged specific nonquantitative limitations which he contends violate the Parity Act by restricting coverage for mental health services but not surgical or medical care treatment. Those nonquantitative limitations include: (1) required compliance with proprietary criteria, (2) application of medical necessity criteria which deviates from generally accepted medical standards, and (3) imposition of an acute care requirement for sub-acute care. (*See, e.g.*, *id.* ¶¶ 66-69, 76.) Thus, the Court finds *Roy C.* distinguishable.

---

[7] *See James C.*, 2021 WL 2532905; *Michael M.*, 2021 WL 1026383, at *1 (decided on cross motions for judgment).

Next, Anthem cites *Welp v. Cigna Health & Life Ins. Co.*, No. 17-80237-CIV, 2017 WL 3263138 (S.D. Fla. July 20, 2017). The *Welp* court found that the plaintiff did not state a claim for relief under the Parity Act because he misidentified the relevant limitations related to wilderness treatment centers and failed to compare them to any medical or surgical analogues. *Id.* at *7. In this case, however, B.H. articulates limitations and compares those to analogues. (ECF No. 2, ¶¶ 29-31, 70.) Furthermore, the *Welp* court confirms that plaintiffs "need not plead specific details with respect to the appropriate standards of care," nor do plaintiffs need to "spell out the particular medical/surgical criteria which demonstrate disparity," but rather plaintiffs must simply "identify the treatments in the medical/surgical arena that are analogous to the sought-after mental health/substance abuse benefit and allege that there is a disparity in their limitation criteria." *Welp*, 2017 WL 3263138, at *6 (internal citations and emphasis omitted). B.H.'s Complaint achieves that level of specificity. (*See generally* ECF No. 2, ¶¶ 24, 28-29, 41, 64-76.)

Anthem also relies on *Charles W.*, 2019 WL 6895331. In *Charles*, the court found the plaintiffs' allegations insufficient to state a claim because they "simply parrot the language of the statute and implementing regulation." *Id.* at *4. For example, the plaintiffs alleged in a conclusory manner that the Plan excluded coverage for medically necessary care for behavioral treatment "based on geographic location, facility type, provider specialty or other criteria," but failed to identify any specific limitation in the Plan or in any denial letter from the administrator. *Id.* at *4- 5. The plaintiffs also generally alleged, without factual support, that the administrator used "processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment" compared to coverage provided for medical or surgical conditions. *Id.* at *5. Finally, the plaintiffs identified a category of "sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities" which they claimed

were analogous to the treatment received by the participant at a "therapeutic boarding school." *Id.* at *1, 5. The *Charles* court found these allegations conclusory because the plaintiffs failed to "explain how the treatment in these facilities is analogous to the treatment [the participant] received." *Id.* at *5. Therefore, the court dismissed the Parity Act claim as insufficiently pled. *Id.*

The Court finds the *Charles* decision, which is not binding precedent, distinguishable and unpersuasive. As an initial matter, Anthem does not appear to challenge that B.H. has identified at least some appropriate medical or surgical care treatment (skilled nursing facilities and rehabilitation facilities) analogous to the residential treatment received by K.H. (*See* ECF No. 22, at 7-8.) Next, unlike in the *Charles* decision, B.H. does not simply parrot the requirements of the Parity Act. Instead, he alleges specific nonquantitative limitations outlined above that he contends create the disparity. (*See, e.g.*, ECF No. 2, ¶¶ 66-69, 76.)

Although very few district courts in the Fourth Circuit have addressed this issue, numerous other district courts have found allegations similar to B.H.'s sufficient to state a Parity Act claim. For example, in *K.K.*, 2020 WL 262980, the court found that the plaintiffs adequately alleged a Parity Act violation by identifying the same three types of analogous medical treatments (skilled nursing facilities, inpatient hospice care, and rehabilitation centers) and claiming that more restrictive criteria was imposed on the plaintiffs' child's mental health treatment. *Id.* at *4.

Similarly, in *Nathan W.*, 2021 WL 842590, the court found the plaintiffs' allegations sufficient where, like B.H., they alleged "that Defendants used acute medical necessity criteria to evaluate the non-acute mental health/substance abuse treatment" received. *Id.* at *7-8. The court "d[id] not find that Plaintiffs' inability to provide specific documentation or more detailed factual allegations regarding the disparity in treatment limitations warrant[ed] dismissal at this stage," reasoning that discovery is generally needed to prove a coverage disparity. *Id.* at *8.

As another example, in *Johnathan Z.*, 2020 WL 607896, the court held that plaintiffs plausibly pled a disparity by claiming that the defendant used sub-acute criteria for mental health treatment. *Id.* at *19. The court was "guided by the notion that the Parity Act analysis 'counsels against a rigid pleading standard' because of the discrepancy in information between plaintiffs and defendants, particularly related to the treatment limitations that insurers apply to analogous medical/surgical care when the insureds did not receive that care." *Id.* (citing *Michael W. v. United Behav. Health*, 420 F. Supp. 3d 1207, 1235 (D. Utah 2019)). The court further acknowledged that "Parity Act claims generally require further discovery to evaluate whether there is a disparity" and thus gave Plaintiffs more latitude to plead disparities "because of the lack of available information regarding the relevant point of comparison and the inability for Plaintiffs to glean this information from their administrative claims processes." *Id.* (internal citations omitted). Lastly, the court recognized that similar claims have proceeded past the motion to dismiss stage "to determine what medical necessity criteria is applied," and allowed the plaintiffs' claim to do the same. *Id.* at *19.

Even the *Michael M.* case, cited by Anthem and decided on cross motions for judgment, appears to acknowledge the sufficiency of B.H.'s allegations at the motion to dismiss stage. 2021 WL 1026383. In that decision, the plaintiffs argued that "the Plan required Plaintiffs to satisfy acute care medical necessity criteria to obtain mental health treatment benefits, but it applied sub-acute criteria in evaluating medical necessity for comparable medical/surgical treatment." *Id.* at *13. The court stated that "[s]uch a disparity," if proven, "would constitute a violation of the [Parity Act]." *Id.* (citing *Theo M. v. Beacon Health Options*, No. 2:19-CV-364-JNP, 2020 WL 5500529, at *5 (D. Utah Sept. 11, 2020)). Here, B.H. alleges this very fact pattern as one of the nonquantitative limitations creating a disparity and cites Anthem's denial letter as further factual support for the same. (ECF No. 2, ¶¶ 24, 41, 66, 70-75.)

Multiple other district courts have likewise denied Rule 12(b)(6) motions seeking to dismiss Parity Act claims based on similar allegations. *See e.g., Michael W.*, 420 F. Supp. at 1236-37 (denying motion to dismiss where Plaintiffs' complaint alleged "that Defendants' standards for evaluating medical necessity are stricter for continued care at Residential Treatment Centers than for continued care at medical/surgical inpatient facilities offering analogous levels of treatment, including skilled nursing facilities, inpatient rehabilitation facilities, or inpatient hospice care" and that "'acute care medical necessity criteria' [w]as the standard by which it evaluated [the patient's] need for continued treatment"); *Peter E. v. United HealthCare Servs., Inc.*, No. 2:17-CV-00435-DN, 2019 WL 6118422, at *2, 6 (D. Utah Nov. 18, 2019) (finding Parity Act claim sufficiently pled based on allegations that the defendant "differentially evaluates the medical necessity of treatment at mental health treatment facilities . . . and the medical necessity of treatment at analogous medical/surgical facilities, *i.e.* sub-acute inpatient treatment programs like skilled nursing facilities, inpatient hospice care, and rehabilitation facilities" and "differentially evaluates intermediate level treatment claims, applying generally accepted standards of medical practice in medical/surgical coverage determinations while applying criteria deviating from generally accepted standards in mental health coverage determinations") (internal citations omitted); *K.K. v. Premera Blue Cross*, No. C21-1611-JCC, 2022 WL 1719134, at *3 (W.D. Wash. May 27, 2022) (finding plaintiff pled a Parity Act claim where the allegations concerned "medical necessity criteria and requirement of acute symptoms for sub-acute mental health residential treatment, which [the insurer] does not require for medical and surgical treatment at analogous facilities"); *Patrick S. v. United Behav. Health*, 516 F. Supp. 3d 1303, 1309 (D. Utah 2021) ("Importantly, this Court has consistently held that an allegation like Plaintiffs'–that a defendant insurance company applied acute medical necessity criteria to the subacute inpatient mental health treatment but does

not apply the acute standard to the subacute inpatient medical/surgical analogues–is sufficient to state a claim").

Consistent with these decisions, this Court finds that the Complaint's allegations allege a plausible Parity Act violation.  First, B.H. sufficiently identified two treatment limitations: (1) Anthem required K.H. to meet proprietary criteria requirements to receive coverage for mental health treatment; and (2) Anthem utilized medical necessity criteria in evaluating K.H.'s claim for mental health care that deviates from generally accepted standards of medical practice.  (ECF No. 2, ¶¶ 64, 66, 68-69, 76.)  Second, B.H. identified three analogous medical/surgical treatment facilities for comparison to the residential treatment received by K.H.: (1) skilled nursing facilities; (2) inpatient hospice care; and (3) rehabilitation facilities.  (*Id.* ¶ 65.)  Third, B.H. alleges that a plausible disparity exists in applying these limitations to mental health care benefits, but not medical or surgical treatment received at the analogous facilities.  B.H. alleges that the Plan exempts medical or surgical benefits from compliance with the same restrictive proprietary criteria and applies less restrictive medical necessity criteria that complies with generally accepted standards of medical practice, including by not requiring acute level symptoms for receipt of sub-acute care.  (*Id.* ¶¶ 29, 64-76.)  In support, B.H. quotes Anthem's denial letters stating that K.H.'s care was not medically necessary because she was not a danger to herself or others, did not have serious problems functioning, and did not show characteristics such as hearing voices or persistent thoughts of harm.  (*Id.* ¶¶ 25, 70, 75.)  Taking these allegations as true and viewing them in the light most favorable to B.H., the Complaint states a plausible claim for relief under the Parity Act.

3.  *At this Stage, the Court Declines to Resolve Disputes of Fact Regarding Whether a Disparity Actually Exists*

Anthem next argues that B.H.'s allegations "are contradicted by the terms of the Plan" and the actual clinical criteria, and therefore, analysis of the Plan document and clinical criteria shows

21

that no plausible disparity can exist.  (ECF No. 22, at 12.)  Much of Anthem's motion focuses on the exhibits it attaches in support, and Anthem asks the Court to analyze the exhibits and disregard factual allegations in the Complaint that appear contrary to those documents.  (*Id.* at 12-15.)

At this stage of the litigation, however, the Court must take B.H.'s allegations as true, draw reasonable inferences in B.H.'s favor, and resolve the Rule 12(b)(6) motion by determining whether the factual allegations state a plausible claim.  The Court is *not* responsible for "resolv[ing] contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Feldman v. L. Enf't Assocs. Corp.*, 779 F. Supp. 2d 472, 480 (E.D.N.C. 2011), nor is B.H. responsible for *proving* his case at this point.  *Pinder v. Knorowski*, 660 F. Supp. 2d 726, 737 (E.D. Va. 2009).  *See Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 269 (4th Cir. 2022).  Therefore, the Court declines to resolve contests of facts regarding what the exhibits do or do not require.

The Court also notes that even if it were inclined to consider the exhibits and were to find no disparity on the face of the documents, that would not impact B.H.'s as-applied Parity Act challenge.  "[I]n other words, simply because a plan does not explicitly discriminate against mental health benefits is not grounds to dismiss a Parity Act claim.  Instead, if a plaintiff properly alleges that the health plan provider has 'differentially applied a facially neutral plan term,' then the claim can proceed."  *K.K.*, 2020 WL 262980, at *3 (quoting *Peter E.*, 2019 WL 6118422, at *2).

In any event, as discussed above, the Court will not consider the exhibits attached to the Motion to Dismiss given the dispute as to their authenticity.  *See supra* Part.IV.A.  Without considering these documents, the Court cannot determine whether the alleged disparities in the Plan are discriminatory on their face, that is in their written language, or as applied, that is in operation.  *See Johnathan Z.*, 2020 WL 607896, at *13.  Courts often need further discovery to

reach such a conclusion, making this inquiry more appropriate at a later state of litigation. *See Nathan W.*, 2021 WL 842590, at *8.

## V.    CONCLUSION

After careful consideration of the record, and for the reasons set forth above, the Court RECOMMENDS that Anthem's Partial Motion to Dismiss Complaint (ECF No. 21) be DENIED. Let the clerk forward a copy of this Report and Recommendation to United States District Judge Roderick C. Young and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

Summer L. Speight
United States Magistrate Judge

Richmond, Virginia
Date: July 27, 2023